UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TURBULENT DIFFUSION TECHNOLOGY INC., | CIVIL ACTION NO. 15-7105(MLC) |
| Plaintiff, | **MEMORANDUM OPINION** |
| v. | |
| AMEC FOSTER WHEELER NORTH AMERICA CORPORATION, | |
| Defendant. | |

Plaintiff Turbulent Diffusion Technology Inc. ("TDT") filed suit against Defendant Amec Foster Wheeler North America Corporation ("Amec Foster Wheeler") alleging breach of contract, anticipatory repudiation, wrongful termination, and breach of the covenant of good faith and fair dealing. (See dkt. 1.)[1] On October 24, 2016, TDT filed an amended complaint maintaining the same counts. (See dkt. 22.) On November 3, 2016, Amec Foster Wheeler answered TDT's Amended Complaint and brought counterclaims alleging breach of contract, breach of the covenant of good faith and fair dealing, breach of express warranty, breach of implied warranty of fitness for a particular purpose, and fraud in the inducement. (See dkt. 24.) Counterclaim-Defendant TDT filed the pending Motion to Dismiss, seeking to dismiss only Amec Foster Wheeler's

---

[1] The Court will cite to documents filed on the Electronic Case Filing System ("ECF") by referring to the docket entry numbers as "dkt." Pincites reference ECF pagination.

1

counterclaim for fraud in the inducement. (See dkt. 25.) The Court resolves this motion without oral argument. See L.Civ.R. 78.1(b). For the reasons stated herein, we will grant TDT's Motion to Dismiss.

## I. BACKGROUND

### A. General Background

In August 2013, Amec Foster Wheeler entered into a contract with a third party, CH2-UGL JV ("CH2"), to supply and install utility boilers for CH2 at the Ichthys Combined Power Plaint in Darwin, Australia. (Dkt. 24 at 11.) Amec Foster Wheeler and TDT entered into a purchase order agreement ("Purchase Order"), wherein TDT agreed to design, manufacture, supply, and deliver three burner and valve train skid systems ("the Equipment") for a contract price of $1,649,326.63 to Amec Foster Wheeler. (Id. at 11-14.) The Equipment designed and manufactured by TDT was to be supplied by Amec Foster Wheeler for installation at the Ichthys Combined Cycle Power Plant in Darwin, Australia pursuant to all codes applicable in the Northern Territories of Australia. (Id. at 12.)[2]

After approximately two years and some level of performance of its obligations pursuant to the Purchase Order, or lack thereof, TDT sent Amec Foster Wheeler a notice of breach and demand for adequate assurances, pursuant to N.J.S.A. 12A:2-609. (Dkt. 22

---

[2] The Purchase Order addresses compliance with Australian codes with multiple contract provisions. For example, under "Scope of Supply/Pricing," the Purchase Order states that "[e]quipment supplied under this PO shall comply with Australian Codes and Standards as applicable and referenced in the PO technical specifications and documents. (Dkt. 22-1 at 18-19.) Under Section 6.2 entitled Warranties, the Purchase Order states that the Seller warrants that the work will "[c]omply with all Applicable Laws, codes, regulations and rules." (Id. at 14.)

2

at 10; dkt. 22-3.) Amec Foster Wheeler responded with a Notice of Termination and Cancellation, terminating the Purchase Order for a variety of reasons. (See dkt. 22 at 10; dkt 22-4; dkt. 24 at 20-21.)

TDT and Amec Foster Wheeler bring forth competing claims relating to the breach of the Purchase Order. (See dkt. 22 at 11-17; dkt. 24 at 26-30.) Because these claims are not germane to this Motion to Dismiss, we will not describe them in detail here. Instead, we focus on the factual allegations related to the fraud in the inducement claim asserted by Amec Foster Wheeler. However, we note that Amec Foster Wheeler's breach of contract, breach of express warranty, and breach of implied warranty claims are based, in part, on the alleged noncompliance of the Equipment with the terms and specifications of the Purchase Order, which include the Australian codes. See n. 2, supra.

Prior to the execution of the Purchase Order, and in connection with its bid evaluation process, Amec Foster Wheeler met with TDT in June 2013. (Id. at 31.) Amec Foster Wheeler alleges that TDT, in an effort to induce Amec Foster Wheeler to issue and execute the Purchase Order, represented that "its work would comply with the Australian Code requirement" and that "it would meet this requirement through a subcontract with Optimil Machinery, Inc." ("Optimil"). (Id. at 31.) Amec Foster Wheeler further alleges that TDT made the following additional representations at the June 2013 meeting: (1) "all equipment ordered through TDT will be fabricated at [Optimil], in Delta, British Columbia, Canada"; (2) "TDT had a 'partnership' with Optimil"; (3) "TDT maintained 100% control of work in the shop of Optimil"; and (4) "[Optimil] had performed projects in Australia, was familiar with Australian codes and standards and was "confident" in its

3

ability to comply with Australian codes that governed [the] work." (Id. at 31.) Amec Foster Wheeler alleges that at the time of the June 2013 meeting, TDT knew that its representations regarding Optimil were false, and that they were made with the intention that Amec Foster Wheeler rely on them to issue the Purchase Order to TDT. (Id. at 32-33.) Amec Foster Wheeler alleges that it did rely on these misrepresentations and executed the Purchase Order to its detriment. (Id. at 33.)

### B. The Parties' Positions

TDT offers three arguments in favor of dismissing Amec Foster Wheeler's claim for fraud in the inducement: (1) the claim is barred by the economic loss doctrine; (2) the claim is barred by the Purchase Order's integration clause; and (3) the claim should be dismissed because Amec Foster Wheeler did not allege facts that demonstrate that the alleged misrepresentations were material. (Dkt. 25-1 at 4-5.) The following is a summary of the parties' positions on these issues.

#### 1. The Economic Loss Doctrine

"The economic loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract.'" Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F.Supp.2d 557, 562 (D.N.J. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec. Co., 6 F.3d 604, 618 (3d Cir.1995)). "In particular, 'whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties.'" RNC Sys. v. Modern Tech. Group, Inc., 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (quoting Chen v. HD Dimension Corp., No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010)).

4

"For instance, a plaintiff may be permitted to proceed with tort claims sounding in fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement." Id. (citations omitted). However, "only those pre-contractual misrepresentations that are *extraneous* to the parties' contract may be brought alongside a breach of contract claim." Montclair State University v. Oracle USA, Inc., No. 11-2867, 21012 WL 3647427, at *4 (D.N.J. Aug. 23, 2012) (citations omitted).

> An alleged misrepresentation is extraneous to an agreement when it breaches a duty separate and distinct from the performance of the agreements terms. In other words, an act that is in breach of a specific contractual undertaking would not be extrinsic, but an act that breaches some other duty would be. Hence, an alleged misrepresentation that involves a nonfulfillment of a warranty or guarantee contained within the contract itself cannot be said to be extraneous to the contract.

Id. at *5 (quotations and citations omitted).

TDT argues that the misrepresentations forming the basis of Amec Foster Wheeler's fraud in the inducement claim relate directly to the performance of the Purchase Order. Specifically, TDT argues that its statements that "its work would comply with the Australian Code requirement" and that "it would meet this requirement through a subcontract with Optimil" directly relate to the express terms of the Purchase Order, (*i.e.*, the Australian code requirement). (Dkt. 25-1 at 10.) TDT asserts that its additional statements concerning its relationship with Optimil directly relate to the performance of the Australian code requirement.

5

TDT also argues that the alleged misrepresentations relate to the use of a subcontractor, an issue that is directly addressed in Section 8.5 of the Purchase Order:

> 8.5  No part of the work shall be sublet by Seller to another party at any tier except with the prior written approval of Purchaser.  If Seller intends to subcontract any work, the identity and location of the proposed subcontractor(s) and the scope of their work must be submitted by Seller in writing for Purchaser's approval.  The location of origin of all work performed by each approved subcontractor shall be the country of the location of the subcontractor approved by Purchaser.  Seller shall impose on each of his subcontractor(s) the applicable requirements of this Purchase Order.  Purchaser shall be furnished with three fully executed copies of all such subcontracts.  Notwithstanding such subcontracting, Seller shall have the sole and full responsibility for fulfilling all of Seller's obligations under this Purchase Order, and Seller shall assume full responsibility to Purchaser and Purchaser's Customer for the acts and omissions of its subcontractors and their employees to the same extent as Seller is responsible for Seller's own acts or omissions.

(Dkt. 22-1 at 6.)  Based on this provision of the Purchase Order, TDT argues that any alleged statement pertaining to Optimil was necessarily intrinsic to the Purchase Order.  (Dkt. 25-1 at 11.)

TDT also argues that Amec Foster Wheeler's fraud in the inducement claim cannot be extrinsic because the damages sought for that claim are identical to those sought in connection with Amec Foster Wheeler's contract-based claims.  (Id. at 12.)

Amec Foster Wheeler argues that the economic loss doctrine does not bar its fraud in the inducement claim because the alleged misrepresentations are extrinsic to the performance of the Purchase Order.  Specifically, Amec Foster Wheeler argues that TDT's representations relating to its preexisting relationship with Optimil and its control

6

over the manufacturing process to be performed by Optimil "resulted in a companion misrepresentation as to TDT's capability to meet the requirements of its contract with Amec Foster Wheeler." (Dkt. 31 at 22-23.) Amec Foster Wheeler also points out that the Purchase Order "does not address the relationship between TDT and Optimil or the existing capabilities of TDT and use of Optimil to meet the specifications for the Purchase Order work." (Id. at 23.)

With respect to the similarity of damages, Amec Foster Wheeler states that its failure to expressly seek recovery of punitive damages, available for its claim for fraud in the inducement, was an oversight. (Dkt. 31 at 30 n. 2.) Thus, Amec Foster Wheeler requests leave of Court to seek such damages if its claim survives. (Id.)

### 2. The Integration Clause

"In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms." CDK Global, LLC v. Tulley Auto. Grp., Inc., No. 15-3103, 2016 WL 1718100, at *3 (D.N.J. Apr. 29, 2016). There is an exception for fraud in the inducement. However, for that exception to apply, the alleged fraud "must concern a matter not addressed in the agreement." Id. In other words, for a fraud in the inducement claim to survive, "the subject of the misrepresentation must be extraneous to the agreement." Id.

When "misrepresentations made during the course of negotiations are addressed by the terms of the contract, the claim becomes one for breach of contract, not fraudulent inducement." Id. In such cases, the integration clause will bar the fraud claim. See

7

RNC, 861 F. Supp. 2d at 455 (finding the fraudulent inducement claim to concern matters "expressly addressed in the integrated writing" and therefore holding the misrepresentations inadmissible under the integration clause and the parol evidence rule). When the misrepresentations are extrinsic to the contract and can support a claim of fraud in the inducement, an integration clause does not act to bar those counts. See CDK, 2016 WL 1718100, at *4 (finding that the statements were independent of the contract terms and therefore were not barred by the integration clause).

      The Purchase Order contains an integration clause which states:

> THIS PURCHASE ORDER INCLUDING ALL ATTACHMENTS WHICH ARE MADE A PART HEREOF, CONTAIN THE ENTIRE AND SOLE AGREEMENT BETWEEN BUYER AND SELLER CONCERNING THIS SCOPE OF SUPPLY.  ANY REPRESENTATION, WARRANTY, PROMISE OR CONDITION NOT INCORPORATED HEREIN SHALL NOT BE BINDING ON EITHER PARTY.  ANY ADDITIONAL OR DIFFERENT TERMS PROPOSED BY SELLER ARE HEREBY DEEMED TO BE MATERIAL ALTERATIONS AND NOTICE OF REJECTION OF THEM HEREBY GIVEN.

(Dkt. 22-1 at 2.)  TDT argues that the alleged misrepresentations relate to the use of Optimil as a subcontractor, a topic that is dealt with in the Purchase Order.  In view of this integration clause and the provision pertaining to the approval of subcontractors in Section 8.5 of the Purchase Order, see Section I.B.1, supra, TDT argues that Amec Foster Wheeler's alleged reliance on any pre-contractual oral representations relating to the use of a subcontractor is "manifestly unreasonable."  (Dkt. 25-1 at 13-14.)

      Amec Foster Wheeler argues that Section 8.5 of the Purchase Order "only addresses the procedure by which TDT may obtain approval for the use of a

subcontractor to complete its Purchase Order work" and "does not address the controlled relationship between TDT and Optimil, nor does it address TDT's capability to satisfy the Purchase Order's classification or code requirements and the means by which TDT will satisfy said requirements." (Dkt. 31 at 25-26.) Amec Foster Wheeler argues that the integration clause cannot bar its fraud in the inducement claim because the subject matter of the alleged misrepresentations is not specifically addressed within the Purchase Order. (Id.)

### 3. Materiality of Alleged Misrepresentations

"In order to establish a claim for fraudulent inducement, five elements must be shown: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." RNC, 861 F. Supp. 2d at 451.

TDT argues that Amec Foster Wheeler fails to allege facts demonstrating that TDT's alleged misrepresentations relating to Optimil were material. Specifically, TDT argues that there is no allegation that TDT was incapable, on its own, of performing in accordance with the Purchase Order's specification or that Amec Foster Wheeler would not have awarded the Purchase Order to TDT but for its alleged misrepresentations relating to its anticipated use of Optimil as a subcontractor. (See dkt. 25-1 at 14-15.) TDT takes the position that its alleged misrepresentations would only be material if Optimil was ultimately used as a subcontractor, which Amec Foster Wheeler alleges it was not. (Id. at 15.)

9

Amec Foster Wheeler argues that it has, in paragraphs 9, 35-37, and 84-88 of its Amended Counterclaim (dkt. 24), clearly articulated with specificity that the requirement that the equipment to be supplied by TDT meet Australian code was a critical condition of the Purchase Order work. (See dkt. 31 at 28.) Amec Foster Wheeler argues that TDTs representation that it would meet this critical condition through work completed by Optimil was therefore material. (See id.) Alternatively, Amec Foster Wheeler requests leave to amend its pleading if this Court determines that the fraud in the inducement count is not sufficiently pled. (See id. at 29-30.)

## II. DISCUSSION

### A. Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. Cty of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 261, 374 n.7 (3d Cir. 2002)). A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "The defendant bears the burden of showing that no claim has been presented." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to set forth "a short and plain statement of the claim showing that a pleader is entitled to relief." Fed. R. Civ.

P. 8(a)(2). The pleading standard of Rule 8 does not require detailed factual allegations, but demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). In addition, the plaintiff's "short and plain statement of the claim" must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 545 (citation omitted).

When a motion to dismiss involves an action for fraud, to comply with Rule 9(b) a plaintiff may not rely merely on conclusory statements, but must instead indicate at the very least who made the material misrepresentation giving rise to the claim and what specific representations were made. South Broward Hosp. Dist. V. MedQuist Inc., 516 F. Supp. 2d 370, 280 (D.N.J. 2007); see also Grant v. Turner, No. 09-2381, 2010 WL 4004719, at *2 (D.N.J. Oct. 12, 2010). To satisfy Rule 9(b), a plaintiff "must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. Lum v. Bank of Am., 361 F.3d 217, 223-24 (3d Cir. 2004).

When considering a Rule 12(b)(6) motion to dismiss, a court may consider allegations in the complaint, documents attached thereto or specifically referenced therein, and matters of public record. Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998).[3]

---

[3] Fed. R. Civ. P. 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be

B.  Analysis

The Court will begin by addressing the integration clause in the Purchase Order, which TDT maintains is a bar to Amec Foster Wheeler's fraud in the inducement claim. For the following reasons, we agree.

The alleged misrepresentations fall within the scope of the Purchase Order's integration clause. Ass discussed above, the integration clause states, in part, "ANY REPRESENTATION, WARRANTY, PROMISE OR CONDITION NOT INCORPORATED HEREIN SHALL NOT BE BINDING ON EITHER PARTY." (See dkt. 22-1 at 2.) The alleged misrepresentations were made orally to Amec Foster Wheeler prior to the execution of the contract and were not incorporated into the Purchase Order.

The alleged misrepresentations by TDT are not "wholly extraneous to the writing" and relate to "matters expressly addressed in the integrated writing." Travelodge Hotels, Inc. v. Honeysuckle Enters., 357 F. Supp. 2d 788, 795 (D.N.J. 2005). TDT's alleged representation that "its work would comply with the Australian Code requirement" is covered by multiple contractual provisions in the Purchase Order, and is therefore not extraneous. See n. 2, supra. Amec Foster Wheeler does not raise any contrary arguments

---

treated as one for summary judgment." Fed. R. Civ. P. 12(d). If a motion is treated as one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 775 (3d Cir. 2013). Here, Amec Foster Wheeler's opposition brief attaches and makes reference to the transcript and exhibits from the deposition of Robert Pinder in this matter, none of which were referenced in or attached to TDT's Amended Complaint or Amec Foster Wheeler's Answer and Counterclaims. In accordance with Rule 12(d), the Court declines to consider these documents for the purposes of this Rule 12(b)(6) motion.

with regards to this specific representation. (See dkt. 31 at 24-26.) Rather, Amec Foster Wheeler's arguments focus on TDT's representations concerning how it planned to meet that specific contractual requirement with the aid of a specific subcontractor. (See id. at 25-26.) These representations, however, relate to TDT's obligations under the contract to meet the Australian code requirement. As a result, they cannot be "wholly extraneous." TDT's alleged failure to meet the Australian Code requirement is in essence a breach of contract claim and cannot sustain a claim for fraud in the inducement.

Amec Foster Wheeler's fraud in the inducement claim is much different than the fraud in the inducement claim that survived a motion to dismiss in CDK Global, LLC v. Tulley Auto. Grp., Inc., No. 15-3103, 2016 U.S. Dist. LEXIS 57186 (D.N.J. Apr. 29, 2016). In that case, CDK, a technology solutions company that develops and sells automotive dealer management systems, approached Tulley offering one of its management systems. See CDK, 2016 U.S. Dist. LEXIS 57186, at *3-4. Prior to an agreement of sale, CDK represented to Tulley that the management system would work for Tulley's specific three-dealership business, would increase efficiency, and would reduce costs. Id. at *4. Tulley relied on these representations and entered into a service agreement. Id. at *4-5. After installation, Tulley began having problems with the management system and ultimately filed suit. See id. at *5-7. CDK filed a motion to dismiss, *inter alia*, Tulley's fraudulent inducement claim in view of the integration clause in the service agreement. Id. at *10-11.

The court found that the integration clause did not bar Tulley's fraudulent inducement claim because the alleged misrepresentations were extrinsic to the to the

13

service agreement. The court noted that the service agreement dealt primarily with the terms of the lease, installation of software, and support service provided by CDK, but did not speak specifically to Tulley's particular business needs and how the management system would work to meet them. Id. at *11.

Here, all of the alleged misrepresentations concern the same subject matter, TDT's ability to meet the Australian code requirement. Unlike the agreement in CDK, the Australian code requirement is a contractual requirement expressly included in the Purchase Order.

Further, although Optimil, a specific subcontractor, is not identified in the Purchase Order, the Purchase Order includes a specific provision for the use and approval of subcontractors. See Section I.B.1, supra. Nothing in the Purchase Order requires TDT to use Optimil as a subcontractor for any particular purpose. In fact, the provision related to subcontractors bars TDT's ability to utilize a subcontractor without prior written approval from Amec Foster Wheeler. (See dkt. 22-1 at 6 ("No part of the work shall be sublet by [TDT] to another party at any tier except with the prior written approval of [Amec Foster Wheeler].")) The subcontractor provision also makes clear that TDT "shall have the sole and full responsibility for fulfilling all of [TDT]'s obligations under this Purchase Order." "[I]t is manifestly unreasonable" for a party to rely on prior representations when the express language of the contract is written "explicitly nullifying any previous agreements, oral or written." Alexander v. CIGNA Corp., 991 F. Supp. 427, 436 (D.N.J. 1998). "A contractual provision flatly contradictory to prior oral assurances should cause most people – and particularly experienced, knowledgeable

14

business people – to pause." Id. (quoting Elias Bros. Rests., Inc. v. Acorn Enters., Inc., 831 F. Supp. 920, 924 (D. Mass. 1993)). Here, the Purchase Order contemplates the use of subcontractors, but does not limit the subcontractors TDT may use to only Optimil. TDT could arguably perform its obligations without the use of Optimil, or any subcontractor, and satisfactorily perform under the terms of the Purchase Order. Thus, TDT's alleged representations about Optimil pertaining to its obligations to meet the Australian code requirement are contradictory to the terms of the integrated writing. We find that based on the integration clause and the provision of the Purchase Order regarding the use of subcontractors, Amec Foster Wheeler's reliance on TDT's alleged misrepresentations is not reasonable and therefore cannot sustain Amec Foster Wheeler's claim for fraud in the inducement.

Because the fraud claim is barred based on the integration clause, the Court need not reach TDT's additional arguments.

Dismissal of a count in a complaint with prejudice is appropriate if amendment would be inequitable or futile. Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004). Because we find Amec Foster Wheeler's claim for fraud in the inducement is barred by the integration clause of the Purchase Order, amendment is futile. Therefore, we will dismiss the claim with prejudice.

## III. CONCLUSION

For the reasons discussed herein, the Court will grant TDT's Motion to Dismiss with Prejudice. An appropriate Order follows.

                                                                                        s/ Mary L. Cooper
                                                                                      **MARY L. COOPER**
                                                                                      United States District Judge

**Dated:** May 4, 2017